## PEOPLE v HRYSHKO

Docket No. 87355. Submitted March 1, 1988, at Detroit. Decided May 18, 1988. Leave to appeal applied for.

John W. Hryshko was charged with bribing a public employee. He was convicted, Macomb Circuit Court, Kenneth B. Glaser, J. Defendant appealed, alleging that the court erred in refusing to give a requested instruction on making illegal campaign contributions, a misdemeanor, in refusing to give a requested instruction on attempted bribery and in allowing certain remarks by the prosecutor during closing argument.

The Court of Appeals *held:*

1. A trial court in a felony trial should give a properly requested misdemeanor instruction where there is an appropriate relationship between the charged offense and the misdemeanor, the requested misdemeanor instruction is supported by a rational view of the evidence adduced at trial and there is a dispute as to the element or elements differentiating the two crimes, and the giving of the misdemeanor instruction will not result in undue confusion or some other injustice. There is an appropriate relationship between the charged offense and the requested misdemeanor where the greater and lesser offense both relate to the prosecution of the same interests and are related in an evidentiary manner, so that, generally, proof of the misdemeanor is necessarily presented as part of the proof of the greater offense charged. The court properly denied the misdemeanor instruction because there was no appropriate relationship between bribery and making illegal campaign contributions.

2. The court properly denied the requested attempt instruction. An instruction that defendant attempted to commit the offense charged is properly given only where there is evidence, or on a jury view a lack of evidence, indicating that only an attempt was committed. The evidence did not so indicate.

3. Defendant did not object at trial to the complained of

REFERENCES

Am Jur 2d, Trial §§ 192 *et seq.*, 876 *et seq.*

Lesser-related state offense instructions: modern status. 50 ALR4th 1081.

remarks by the prosecution. The absence of an objection during trial precludes appellate review of allegedly prejudicial prosecutorial remarks unless the prejudicial effect was so great that it could not have been cured by a cautionary instruction and failure to consider the issue would result in a miscarriage of justice. No injustice occurred as a result of the remarks.

Affirmed.

1. CRIMINAL LAW — JURY INSTRUCTIONS — LESSER INCLUDED MISDEMEANORS — OFFENSES.

A trial court in a felony trial should give a properly requested misdemeanor instruction where there is an appropriate relationship between the charged offense and the misdemeanor, the requested misdemeanor instruction is supported by a rational view of the evidence adduced at trial and there is a dispute as to the element or elements differentiating the two crimes, and the giving of the misdemeanor instruction will not result in undue confusion or some other injustice; there is an appropriate relationship between the charged offense and the requested misdemeanor where the greater and lesser offense both relate to the protection of the same interests and are related in an evidentiary manner, so that, generally, proof of the misdemeanor is necessarily presented as part of the proof of the greater offense charged.

2. CRIMINAL LAW — APPEAL — PROSECUTORIAL COMMENT — PRESERVING QUESTION.

The absence of an objection during trial precludes appellate review of allegedly prejudicial prosecutorial remarks unless the prejudicial effect was so great that it could not have been cured by a cautionary instruction and failure to consider the issue would result in a miscarriage of justice.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Mark E. Blumer,* Assistant Attorney General, for the people.

*Richard Paul Zipser & Associates, P.C.* (by *Richard Paul Zipser*), for defendant.

Before: HOOD, P.J., and GILLIS and M. B. BREIGHNER,* JJ.

* Former circuit judge, sitting on the Court of Appeals by assignment.

Per Curiam. Following a jury trial, defendant was convicted of bribery of a public employee, MCL 750.117; MSA 28.312. Defendant was sentenced to two years probation, the first four months to be served in the county jail, and was ordered to perform two hundred hours of community service. The trial court denied defendant's motion for a new trial or a judgment notwithstanding the verdict. Defendant now appeals as of right. We affirm.

Kevin Armstrong, an attorney and a known friend of James Randlett, then Mayor of the City of Warren, testified that defendant approached him on January 27, 1983, when Armstrong was filing a waiver of arraignment form in the prosecutor's office. Defendant was an assistant prosecutor in Macomb County. Defendant stated that he wanted to talk to Armstrong about something. Because another friend of Armstrong's had approached him at the same time, Armstrong spoke with that friend first. When Armstrong left his friend's office, defendant was waiting for him.

The pair went into defendant's office. Defendant asked if it was true, as he had been informed, that Armstrong was a friend of or on good terms with Randlett. When Armstrong responded affirmatively, defendant asked if Armstrong could set up a meeting between himself and Randlett concerning the Ukrainian Cultural Center (UCC). Defendant explained to Armstrong that he was also an attorney for the UCC and that he had obtained tax-exempt status for the UCC. Although the exemption was permanent, absent a change in circumstances, each year Tom Pare, an employee in the assessor's office, would write a letter to the UCC informing it that its exemption was up for review and suggest that defendant, the UCC's representative, contact the assessor's office. Defendant would

then "apply" for the exemption. Pare would then send a letter from the assessor's office "approving" the exemption. When the UCC received the letter, defendant would receive a fee equal to twenty percent of the amount saved because of the exemption. After defendant received his fee, he would "contribute" money to Pare, who, in turn, was supposed to give the money to former mayor Thomas Bates. Defendant complained that he had not received his fee for the past year. Defendant believed that Pare and Jaraslaw Duzey, on the board of directors at the UCC, were working together directly to deprive him of his fee and still continue the UCC's tax-exempt status. Defendant wanted to meet with Randlett to ensure that he would receive his fee. Defendant emphasized that he had given Bates $1,000 in the last year that he was in office. Armstrong told defendant that he would see what he could do.

Armstrong reported his conversation with defendant to Thomas Nelson, the liaison between the mayor's office and the police department. Armstrong later met with Randlett, Edward Servitto, Warren's city attorney, and a representative from the attorney general's office.

On February 22, 1983, defendant stopped Armstrong in a parking lot and asked to meet with him. They went to Armstrong's office where defendant asked if Armstrong was able to arrange a meeting with Randlett. Armstrong stated that he was working on it.

The following day, defendant called Armstrong and told him that he was concerned about the meeting because the tax board of review was meeting in March and he was going on vacation. On February 24, at 5:30 P.M., Armstrong arranged a meeting with Randlett. Defendant, Armstrong

and Randlett attended the meeting in Randlett's office. At the meeting, defendant stated:

> Every time I get a fee, I express my gratitude to the people here at City Hall, you know. I donated generously to the campaign. I think I mentioned, I have been very candid and honest with Kevin [Armstrong]. I told him the last time I gave a donation to the campaign. I gave a grand in cash money for the mayor's campaign.
>
> \* \* \*
>
> I mean, one hand washes the other. I'm the last guy in the world to say that, you know, and if somebody's doing me a favor, I don't forget 'em. Do you know what I'm saying?
>
> \* \* \*
>
> If you shafted me, fine that's your prerogative. You're the top man, you deserve it, you're the boss. You can do anything you want to, to anybody because hell the people put you in there, you're accountable to the people, nobody else runs your office but you.
>
> \* \* \*
>
> So the only other suggestion I would make is if you're still in that position to talk to your assessor and that, you know, this matter is up for review again and write a letter directly to the Cultural Center that says your former representative who arranged for your tax exempt status, we would like to see him again and discuss the matter further, that's my suggestion, you know what I'm saying?

When asked by Armstrong if defendant thought Pare was keeping the money, defendant responded: "I think so. In my personal opinion because you're not getting it." When asked if he dealt with Tom Pare or Ted Bates, defendant responded:

> I dealt with Tom. I didn't want to get involved with Ted. I didn't want to—I never had to get

involved with Ted but Ted must have been aware
of—I don't even deal with—I don't even know if
Ted knows what was going on. Maybe he didn't
know either. Far be it for me to discuss him [sic? it
with him], you know, I don't ask questions. I don't
ask questions, if I make a donation and it—then I
presume its [sic] passed on to the proper people.

*  *  *

I appreciate anything you can do for me, need-
less to say I don't forget my friends.

*  *  *

[I]f anyone is going to do anything for me, it's
right here, right here in this office.

*  *  *

Everything else is confidential and I won't re-
peat anything and I would appreciate it if you
would treat it that way.

Randlett testified that defendant made it clear
that "if I could get him back in the picture then
he would . . . reward his friends."

On March 16, 1983, the following letter was sent
to the UCC in the name of Wayne Erdody, head of
the assessor's office:

I have been reviewing the tax exemption status
of the above-captioned real estate [referring to the
address of the UCC]. It appears that a review of the
tax exemption granted in said real estate must be
made at this time. Our records indicate that Mr.
John Hryshko has represented your organization
in the past regarding this matter.

In the event that Mr. Hryshko is still represent-
ing your organization, please have him contact my
office or if you have a new representative, please
have him contact my office. Please be advised that
the City of Warren Board of Review will meet
from March 21, 1983 through March 28, 1983.

On March 18, defendant met with Randlett and

Armstrong. Defendant called Randlett on March 15, 22, and 25. During the March 22nd call, in discussing an exemption concerning his personal property which was before the board of review, defendant told Randlett: "If you can give me a substantial break on that, I would certainly appreciate that too."

On March 30, defendant met with Randlett and gave him ten $100 bills in a white envelope. At that time, defendant suggested that a similar deal be worked out when the Ukrainian Village, a senior citizen complex, was completed.

On April 7, 1983, defendant called Armstrong and told him that he had to meet with him. Armstrong went to the restaurant suggested by defendant. Once he arrived, defendant recommended that they move to the back of the restaurant. Defendant told Armstrong that earlier in the evening he had been to a Democratic party meeting. There, two councilmen had approached him about the tax-exempt status of the UCC. Defendant asked if Armstrong or Randlett had talked to them about the tax exemption. When Armstrong responded negatively, defendant accused Pare of going to the councilmen because he was now being cut out of the deal. Defendant reiterated that he wanted to deal with Randlett and not Pare or the councilmen and that the situation should be kept confidential. Defendant asked when the letter granting an exemption to the UCC would be sent because he would not receive his remaining fee until the letter arrived. Armstrong stated that he would check into the situation at that time and then left the restaurant.

Defendant called Armstrong the next day. Defendant was concerned because the letter granting the exemption had not yet been sent and there was a rumor that the exemption was not granted.

Defendant assured Armstrong that he had kept the matter confidential. On April 11, 1983, the letter granting the exemption was sent.

On April 26, defendant met with Randlett in the mayor's office. Defendant was unhappy with the letter sent on the 11th because it did not clearly reflect that the UCC was exempt. Therefore, defendant was not going to receive the remainder of his fee. Defendant wanted a new letter, which stated that the exemption had to be reviewed each year, to be sent so that he would continue to receive his fee. A new letter, incorporating defendant's suggestions, was sent on April 27.

On May 19, 1983, defendant and Randlett met again and defendant gave Randlett three $100 bills in a white envelope. Randlett had a fundraiser on June 15, 1983. Servitto sent Duzey fifty tickets to sell. The tickets were $50 each. Defendant had two of the fifty tickets.

Defendant testified that, as an attorney for the UCC, he went to speak with Sherman Faunce, then Warren's city attorney, about acquiring a tax exemption. Faunce told him that neither the mayor nor the council could help him. Instead, he had to go to the board of review. Defendant was told that the exemption he acquired was permanent and all he needed to do was to send a letter each year indicating changes in the UCC's activities. Defendant conceded that he talked with Armstrong and, later, met with Armstrong and Randlett. Defendant claimed that he merely wanted to know the status of the exemption and wanted Randlett to talk to the assessor's office and board of review to determine a possible assessment on the UCC's property if it was not exempt. Defendant intended to use this information to determine his fee. Defendant admitted that he stated that he had contributed up to $1,000 in previous mayoral campaigns

by selling tickets. Thereafter, Armstrong and Randlett called defendant. Defendant met with them on March 18. Randlett told defendant that there was only an application for tax-exempt status in the UCC file. Randlett then asked defendant: "What's in it for me?" Defendant replied that he did not receive his fee until the UCC received a letter stating that it was exempt.

Following the March 18 meeting, Duzey called defendant and asked him to sell twenty tickets to Randlett's fundraiser. When defendant met with Randlett on March 30, he gave him $1,000 from the advance which he had received on his fee, in exchange for the twenty $50 tickets. Randlett stated: "You can do better than that."

Defendant further admitted that he had met with Armstrong at a restaurant on April 7, but only because he was surprised when two councilmen questioned him about the exemption. On May 19, when defendant met with Randlett, he gave him $300 because of Randlett's statement at the March 30 meeting. Defendant insisted that he only told Armstrong and Randlett that he bought and sold tickets for campaigns and made campaign contributions. Defendant conceded that he now knew that such cash contributions were illegal.

Defendant claims that the trial court abused its discretion when it refused his request to instruct the jury on a violation of MCL 169.241(1); MSA 4.1703(41)(1), which provides in part:

A person shall not make . . . any single contribution of $20.01 or more in cash . . . . Contributions of $20.01 or more . . . other than an in-kind contribution . . . , shall be made by written instrument containing the names of the payor and the payee. A person who knowingly violates this section is guilty of a misdemeanor and shall be punished by a fine of not more than $1,000.00, or

imprisoned for not more than 90 days, or. both . . . .

MCL 750.117; MSA 28.312 provides:

Any person who shall corruptly give, *offer or. promise* to any public officer, agent, servant or employe, after the election or appointment of such public officer, agent, servant or employe and either before or after such public officer, agent, servant or employe shall have been qualified or shall take his seat, *any gift, gratuity, money,* property *or other valuable thing,* the intent or purpose of which is to influence the act, vote, opinion, decision or judgment of such public officer, agent, servant or employe, or his action on any matter, question, cause or proceeding, which may be pending or may by law be brought before him in his public capacity, or the purpose and intent of which is to influence any act or omission relating to any public duty of such officer, agent, servant or employe, shall be guilty of a felony. [Emphasis supplied.]

The prosecutor's theory was that on February 24, 1983, defendant offered or promised Randlett money if Randlett helped him continue the UCC's tax-exempt status so that he could continue to receive his fee. Defendant claimed that he had given Randlett $1,300 as a campaign contribution. While defendant conceded that his actions violated MCL 169.241(1); MSA 4.1703(41)(1), he claimed that he had not bribed Randlett. The trial court refused to give defendant's requested instruction on MCL 169.241(1); MSA 4.1703(41)(1), ruling that there was no connection between the offense charged and that misdemeanor and that, in reality, defendant was merely seeking a compromise verdict.

In *People v Stephens,* 416 Mich 252; 330 NW2d

675 (1982), our Supreme Court held that, when a defendant makes a proper request for a misdemeanor instruction where he is charged with a felony, the trial court should give the instruction when (1) there is an appropriate relationship between the charged offense and the misdemeanor, (2) the requested misdemeanor instruction is supported by a rational view of the evidence adduced at trial and there is a dispute as to the element or elements differentiating the two crimes, and (3) the giving of the misdemeanor instruction will not result in undue confusion or some other injustice. To determine whether there is an appropriate relationship between the charged offense and the requested misdemeanor, the greater and lesser offense must both relate to the protection of the same interests and must be related in an evidentiary manner, so that, generally, proof of the misdemeanor is necessarily presented as part of the proof of the greater offense charged. *People v Steele*, 429 Mich 13, 19; 412 NW2d 206 (1987).

As noted above, the prosecution relied on the conversation of February 24 to support its claim that defendant offered or promised Randlett money if Randlett would continue the exemption. No money needed to exchange hands in order to prove the charge. Defendant's defense was that at that meeting he only stated that he had made campaign contributions in the past and that his act of giving Randlett $1,300 was at most a violation of the campaign contribution statute. We agree with the trial court that there was no appropriate relationship between the charged offense and the requested misdemeanor because proof of the misdemeanor is not necessarily presented as part of the proof of the greater offense. See, e.g., *Steele, supra; Stephens, supra.* Hence, the trial

court did not abuse its discretion when it refused to instruct on defendant's requested misdemeanor.

Defendant also claims that the trial court abused its discretion when it refused to instruct on attempt to bribe. We agree with the prosecution that an instruction that defendant attempted to commit the offense charged is properly given only where there is evidence, or on a jury view a lack of evidence, indicating that only an attempt was committed. *People v Adams,* 416 Mich 53; 330 NW2d 634 (1982). On the facts presented, we believe that the trial court properly refused to instruct on attempted bribery. Compare *People v Baxter,* 245 Mich 229; 222 NW 149 (1928).

Finally, defendant claims that several of the prosecutor's remarks during closing argument deprived him of a fair trial. We note that defendant failed to object to most of these remarks. Absent objection, appellate review is foreclosed unless the prejudicial effect was so great that it could not have been cured by an appropriate instruction and failure to consider the issue would result in a miscarriage of justice. *People v Federico,* 146 Mich App 776, 794; 381 NW2d 819 (1985), lv den 425 Mich 867 (1986).

The prosecutor argued:

> We also have testimony from both the Mayor [Randlett] and Kevin Armstrong that there is simply no question that this was done with a corrupt and knowingly illegal purpose in mind. You can get that from virtually every conversation that occurred and the circumstances under which some of them occurred. In particular, I'm referring to the Big Boy Restaurant meeting with Kevin Armstrong. It almost sounds like a scene from the Godfather where you have the person sitting in a quiet restaurant having a clandestine meeting with someone whom he thought he was a [co-]con-

spirator with, Kevin Armstrong. Meanwhile Kevin Armstrong was trying to control his knees, because he was so scared. So, Kevin Armstrong walks in and Mr. Hryshko's first words are not here, let's go back to the back of the restaurant where there is nobody else around. And they went all the way back around the ell [sic? l] [the restaurant was l-shaped] of the restaurant, back where there was no one else and had their private little meeting and the purpose of that meeting was for Mr. Hryshko to make sure through Kevin Armstrong that there were no leaks of their secret agreement.

While defendant did not object to the comment below, he now claims that the reference to *The Godfather* led to an inference that defendant was involved in organized crime. Although defendant's activities were investigated by the Organized Crime and Public Corruption Division of the Attorney General's Office, both John Mulvaney, of the Attorney General's office, and Armstrong testified that this case did not involve organized crime. No error requiring reversal occurred.

The prosecutor also argued:

I believe you can clearly use that evidence along with everything else that happened in this case to conclude that this was not only an offer of money to the Mayor, it was a corrupt offer of money to the Mayor. It was an illegal offer. The man was an attorney with fifteen years of experience—at that point, sixteen years. He was not only an attorney, ladies and gentlemen, he was an attorney in one of the most powerful law enforcement offices in the State of Michigan. The Macomb County Prosecutor was a politician who had been around since they created the earth, George Parris had been continuously in office for twenty-four years in this county and John Hryshko had been with him for sixteen of those twenty-four years—fifteen of those twenty-

four years, and for part of that time he had been the third-ranking official in that office and for part of that time Mr. Hryshko had been the campaign finance manager for the election campaign of George Parris. Now, if you people want to believe the defendant's statement that as an experienced attorney, an attorney experienced in the criminal law who was a specialist in campaign finance law didn't know that it was illegal to give more than $20 in cash, then okay, go ahead and believe it. I don't know why you would, but that's your decision to make.

Although defendant failed to object to these comments below, he now claims that it was improper to argue his employment status as a basis for conviction. We believe that the prosecutor was merely drawing permissible inferences from the evidence to argue that defendant's claim of ignorance regarding the campaign contribution statute was unbelievable. Such argument is permissible. See, e.g., *People v Viaene*, 119 Mich App 690, 696-697; 326 NW2d 607 (1982).

The prosecutor further argued:

Let me remind you, ladies and gentlemen, as I did in my opening statement that reasonable doubt is a fair doubt. It is not any doubt at all . . . . So, you're going to have doubts, but the question is do you have a reasonable legally recognizable doubt. Do you have a doubt which would stop you in your everyday business life from making an important decision that would affect your own lives, that's a reasonable doubt. Remember, ladies and gentlemen, that reasonable doubt is a standard which has traditionally been applied in every criminal case in the history of this country, but there is an awful lot of people in Jackson Prison who have found that burden not impossible to be shown. If you are satisfied that the evidence has proven this case beyond a reasonable doubt, then you must find the defendant guilty.

Even though defendant did not object below, he now claims mentioning Jackson Prison injected the issue of penalty into the case. Again, we find no manifest injustice. In context, the argument was meant to demonstrate that reasonable doubt is not an insurmountable burden. No manifest injustice occurred. *Id.*

The prosecutor also argued:

> This whole business about Mr. Hryshko being subject to the crime of campaign act violence [sic? violations] smacks an awful lot of a bank robber who in his getaway screeching down the expressway at ninety-five or a hundred miles an hour and he's finally stopped by the police officer and then when he finally, ultimately gets to court on the charge of bank robbery he pleads for mercy because he was stopped for speeding. Now, that's what—that's what Mr. York [defendant's attorney] would have you do in this case. He would have you have mercy on his client because he was speeding.
>
> Well, ladies and gentlemen, Mr. York was correct when he said it is an entirely separate crime that Mr. Hryshko may or may not have to face in the future, but [it] has nothing to do with your deliberations about whether or not a bribery occurred in this case. Don't get off on a tangent of wondering if that bank robber was speeding, it has nothing to do with whether or not the bank robbery occurred, just as a campaign act violation in this case has nothing to do with whether or not a bribery occurred . . . .
>
> \* \* \*
>
> So, he's trying to divert your attention with an entirely disassociated event . . . .

Below, defendant moved for a mistrial following these comments because the analogy to bank robbery and speeding in effect told the jury that bribery was a felony and the campaign contribu-

tion violation was a misdemeanor. The trial court denied defendant's motion for a mistrial. Defendant now claims that the analogy was improper because robbery is a violent crime which carries a life sentence. Given our discussion concerning the campaign contribution statute, the prosecutor's argument that defendant was attempting to divert the jury's attention from the bribery issue by claiming he had violated another statute was proper. The bank robbery analogy was intended to make the prosecutor's argument clear to the jury and was not intended to inject punishment into the proceedings. The trial court properly denied defendant's request for a mistrial.

Affirmed.